Peter H. Donaldson (9624)
Cole P. Crowther (16432)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84110-4050
Telephone: (801) 415-3000
Facsimile: (801) 415-3500
peter.donaldson@dentons.com
cole.crowther@dentons.com

*Attorneys for Rejuvica, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| LIQUID HERBALS MANUFACTURING, LLC, d/b/a Liquid Nutra Group,<br><br>Plaintiff,<br><br>vs.<br><br>REJUVICA, LLC,<br><br>Defendant. | **DEFENDANT'S TRIAL BRIEF**<br><br>Case No. 2:22-cv-00387-HCN<br><br>Judge Howard C. Nielson |

Pursuant to this Court's Trial Order [Dkt. 54], Defendant Rejuvica, LLC ("Rejuvica"), through counsel, hereby submits its Trial Brief in advance of the trial scheduled to commence September 22, 2026.

## INTRODUCTION

This case should never have been brought. Plaintiff Liquid Herbals Manufacturing, LLC d/b/a Liquid Nutra Group ("LNG") seeks more than $300,000 for products that were never ordered, never shipped, and never even discussed until LNG filed this lawsuit, over two years after the last communication between the parties. LNG's belated claims are no coincidence: this action was filed only after LNG's now-controlling member, Amber Sabin, was ordered to pay

$428,126 to buy out the 30% interests of Kyle Armstrong and Kyle Dilger in LNG. Whatever Ms. Sabin's motives, the law does not permit recovery for transactions that never occurred.

The evidence at trial will establish three dispositive facts: (1) in March 2020, Rejuvica sent LNG approximately 35 purchase orders (the "Initial Orders") on terms and at prices consistent with the parties' previous agreements and years of prior dealings; (2) LNG rejected those Initial Orders and demanded new terms, including a 25% price increase and half-down payment before production, to which Rejuvica never accepted; and (3) the parties entered into a single, limited agreement for on-hand inventory that was fully performed, but no other agreement was ever reached.

Rejuvica never came to terms with LNG for anything specific beyond that single transaction, and LNG never acted like it had come to terms with Rejuvica on any other purchase. LNG never shipped additional products. LNG never notified Rejuvica it had product ready for purchase. LNG never demanded payment for product. And LNG never contacted Rejuvica at all until it did so indirectly by filing this lawsuit more than two years later. That silence is inconsistent with the existence of any agreement.

LNG's breach of contract claim fails because no contract was ever formed for the products for which LNG seeks payment in this case. LNG itself rejected Rejuvica's Initial Orders, proposed a counteroffer on materially different terms, and Rejuvica never accepted that counteroffer beyond accepting the price terms for a single negotiated transaction in which products shipped and were paid for the same day. Beyond that, there was no offer, no acceptance, and no consideration.

LNG's promissory estoppel claim fares no better. There was no clear and definite promise, and no reasonable reliance: LNG's own policy, unilaterally announced by Ms. Sabin,

required half-down payments it never received. It would be unjust to enforce a contract that was never made or to use equity to enforce a similar result. Under the circumstances it would be grossly unjust to require Rejuvica to pay for product (to the extent it exists) it had no reason to believe had been ordered, and that LNG allegedly completed but let sit unsold for over two years.[1]

## FACTUAL BACKGROUND

*The Parties and Their Relationship*

1. Rejuvica is a California limited liability company formed in 2014 by Kyle Dilger and Kyle Armstrong to develop and sell herbal remedies and natural health and beauty products.

2. LNG is a Utah limited liability company formed in late 2016 with Mr. Dilger, Mr. Armstrong and Amber Sabin, primarily to manufacture Rejuvica's products and expand into a broader contract manufacturing operation over time.

3. The ownership structure originally and in March 2020, was as follows: Amber Sabin (40%), Mr. Dilger (30%), and Mr. Armstrong (30%). Ms. Sabin served as Chief Operating Officer and managed day-to-day operations from LNG's facility in Vernal, Utah.

4. Because Mr. Dilger and Mr. Armstrong held ownership interests in both Rejuvica and LNG, the two companies operated with a uniquely intertwined business relationship known to Ms. Sabin.

5. Mr. Dilger and Mr. Armstrong managed business operations remotely from California. For that reason, as a practical matter, Ms. Sabin the minority owner had physical control of all LNG products that were manufactured and shipped, and the practical ability to unilaterally raise prices, refuse orders, or refuse shipments.

---

[1] The parties have stipulated to the dismissal of Rejuvica's Counterclaims (alternative claims for breach of contract) pursuant to Fed. R. Civ. P. 41(a). [Dkt. 68].

*The Course of Dealing (2016-2019)*

6. From 2016 through 2019, Rejuvica and LNG developed an established course of dealing: Rejuvica would email purchase orders to LNG, LNG would manufacture and ship the requested products, and Rejuvica would pay for the goods when received and verified as completed. By the first half of 2018, the parties had settled into a consistent arrangement under which Rejuvica paid only after receiving and inventorying the products and confirming quality control documents (i.e. FDA documents or Certificates of Analysis) were in hand.

7. This informal payment arrangement reflected the close relationship between the entities and the overlapping ownership interests of Mr. Dilger and Mr. Armstrong.

*LNG's Financial Difficulties and Unilateral Change in Terms*

8. By January 2020, LNG was experiencing serious financial difficulties and running a negative bank balance. Mr. Dilger personally loaned LNG $70,000 to maintain operations and began auditing LNG's expenses. Mr. Dilger and Mr. Armstrong expressed concern about Ms. Sabin's use of company funds for personal expenses. Ms. Sabin denied any impropriety and requested additional funding for LNG, which Mr. Dilger and Mr. Armstrong indicated they were willing to facilitate, subject to certain financial controls. But trust and confidence were severely lacking between Mr. Dilger and Mr. Armstrong, on one hand, and Ms. Sabin on the other hand.

9. On February 27, 2020, Ms. Sabin unilaterally attempted to change the parties' course of dealing by requiring payment by Rejuvica before LNG would ship any product, a significant departure from the parties' long-established course of dealing.

*10.* On March 4, 2020, Mr. Dilger confirmed that Rejuvica intended to continue under the prior arrangement (paying when items were received) and disputed Ms. Sabin's authority to

unilaterally impose new terms. Ms. Sabin resisted and insisted on unilaterally implementing a new procedure that she called a "standard operating procedure."

*The Initial Orders and LNG's Rejection of Those Orders*

11. Throughout March 2020, Rejuvica emailed approximately 35 purchase orders (the Initial Orders) to LNG at the prices Mr. Dilger, Mr. Armstrong, and Ms. Sabin had previously agreed upon and that were consistent with the parties' course of dealing.

12. On March 26, 2020, Ms. Sabin responded to the Initial Orders with an email (the "March 26 Email") attaching 35 invoices that reflected prices increased approximately 25% above those in the Initial Orders. Ms. Sabin stated that "we have implemented new pricing" and that "LNG will need to have half down paid to be put in the queue."

13. On March 30, 2020, Mr. Dilger replied to the March 26 Email (the "March 30 Email"), expressing disagreement with the pricing change while proposing a single limited transaction. Specifically, Mr. Dilger identified on-hand inventory visible in the parties' shared spreadsheet and confirmed that Rejuvica had enough cash to pay for that inventory at the higher prices if it could ship immediately. He requested that those items ship the next day and committed to wiring payment to LNG's account that day. Ms. Sabin agreed to this limited transaction and directed the preparation and shipment of the product the next day when payment was also received.

14. As to any products beyond the on-hand inventory, neither Mr. Dilger nor anyone at Rejuvica ever committed to purchasing specific products at the higher prices demanded or on terms that would require payment before products were put in the queue or shipped. At most, Mr. Dilger had left open the possibility of future purchases expressly contingent upon Rejuvica obtaining a line of credit that would be needed for such purchases.

15. To the extent LNG had started production of any additional products, Mr. Dilger and Mr. Armstrong were unaware of this and would not have expected it, given Ms. Sabin's own new requirement that half down be paid before an order would be put in the queue. As the majority owners of LNG, Mr. Dilger and Mr. Armstrong never considered Rejuvica to have made any other purchases besides the one limited transaction in March, 2020. For that reason, neither of them ever instructed LNG to stop producing Rejuvica product because, from their perspective, there was nothing to stop, as no specific terms had been reached, no half-down payment had been made, and no production should have begun under LNG's stated terms.

16. On March 31, 2020, Rejuvica submitted new purchase orders for the limited purchase of on-hand inventory only (the "Final Orders") to match the invoices at the higher prices, made full payment, and LNG shipped those products the same day. This agreement was made and fully performed by both parties, who had communicated with each other and agreed upon the specific terms of the agreement.

17. After March 31, 2020, Rejuvica submitted no further purchase orders of any kind. LNG never shipped any additional products to Rejuvica, never notified Rejuvica of the status of specific products, never notified Rejuvica that it believed Rejuvica had made a commitment to purchase additional products, and never contacted Rejuvica about any specific products.

*The End of the Relationship and Valuation Case*

18. Meanwhile, disputes between the individuals continued to escalate. On April 8, 2020, Mr. Armstrong and Mr. Dilger, as majority members of LNG, voted to shut down LNG's physical operations due to Ms. Sabin's unwillingness to agree to financial controls and the deterioration of the relationship between them.

19. On April 17, 2020, Mr. Armstrong and Mr. Dilger filed a dissolution lawsuit against Ms. Sabin in state court (the "Valuation Case").

20. On August 6, 2021, following a valuation hearing under a Utah state statutory valuation procedure, Judge Stewart entered an order requiring Ms. Sabin to pay $428,126 to buy out Mr. Dilger and Mr. Armstrong's interests in LNG.

21. LNG did not file this lawsuit until April 4, 2022, more than two years after the last transaction between the parties and only after Ms. Sabin was ordered to pay the buyout amount to Mr. Dilger and Mr. Armstrong.

## ARGUMENT

### I. LNG'S BREACH OF CONTRACT CLAIM FAILS BECAUSE NO CONTRACT WAS FORMED.

Under Utah law, a claim for breach of contract requires proof of "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14, 20 P.3d 388. "[I]t is fundamental that there be a meeting of the minds as to all essential features of a contract." *Terry v. Bacon*, 2011 UT App 432, ¶ 21, 269 P.3d 188. "[A]n offeree's proposal of different terms from those of the offer constitutes a counteroffer, and no contract arises unless the original offeror accepts it unconditionally." *Cea v. Hoffman*, 2012 UT App 101, ¶ 25, 276 P.3d 1178 (cleaned up); *see also R.J. Daum Const. Co. v. Child*, 247 P.2d 817, 821 (Utah 1952) ("A qualified or conditional acceptance is a counter-offer, since such an acceptance is a statement of an exchange that the person making it is willing to make, differing from that proposed by the original offeror."); 1 *Corbin on Contracts* § 3.27 (1993) ("Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer.").

Here, LNG cannot satisfy the threshold requirement that a contract was formed, let alone the remaining elements of its breach of contract claim.

**A. LNG Rejected Rejuvica's Initial Orders and Made a Counteroffer.**

LNG's breach of contract claim rests on the premise that Rejuvica's Initial Orders constituted binding contracts that Rejuvica was obligated to perform. This premise is fatally flawed. Whatever contractual force the Initial Orders may have carried under the parties' prior course of dealing was extinguished when LNG rejected those orders and responded with materially different terms.

On March 26, 2020, Ms. Sabin, acting on behalf of LNG, sent invoices reflecting prices approximately 25% higher than the Initial Orders and imposed a new requirement that Rejuvica pay half down before production could begin. This was not an acceptance of the Initial Orders; it was a rejection and counteroffer on materially different terms.

Notably, Ms. Sabin claims she conducted LNG's cost analysis and implemented the pricing change entirely on her own, without involving or notifying Mr. Dilger (the CFO) or Mr. Armstrong (the CEO) beforehand, who collectively are the majority owners of LNG. She admitted that she believed she had the authority to set prices unilaterally, even over the objection of LNG's other owners, because, according to her, she was "acting in the best interest of LNG." This unilateral action further demonstrates that the March 26 Email was not an acceptance within the existing course of dealing but a new proposal on terms that Rejuvica had no role in setting.

It is black-letter contract law that a response to an offer that changes material terms constitutes a rejection of the original offer and becomes a counteroffer. *See Cea v. Hoffman*, 2012 UT App 101, ¶ 25. The Initial Orders were submitted at then-current prices with the expectation of payment after receipt and inventorying, consistent with the parties' prior

agreements and course of dealing. Ms. Sabin's March 26 Email demanded different prices and different payment terms. At that point, the Initial Orders ceased to exist as enforceable offers. LNG cannot claim that Rejuvica breached contracts based on offers that LNG itself rejected.

**B. Rejuvica Never Accepted the Counteroffer for the Remaining Products.**

LNG is expected to argue that Mr. Dilger's March 30 Email constituted acceptance of the counteroffer for all products. It did not. Mr. Dilger's statement that "[w]e disagree with the pricing change but we have no choice" acknowledged Ms. Sabin's practical control of LNG's physical operations at the manufacturing plant and Rejuvica's limited ability to obtain product at the previously agreed-upon prices. It was not blanket acceptance of all 35 invoices. The individuals were in an adversarial posture with each other, with Ms. Sabin as the minority owner of LNG using her position of physical control to attempt to unilaterally impose terms.

Mr. Dilger ultimately proposed a narrow and specific compromise: he identified on-hand inventory, confirmed Rejuvica had cash to pay for it, and offered to pay the increased prices for those products the next day if Ms. Sabin would ship them the next day. These were all the material terms for that specific agreement. As to anything beyond the on-hand inventory, he stated only that "[t]he rest we will need our LoC or another amazon transfer." This language identifies no specific products, commits to no quantity, sets no timeline, and makes any future purchase expressly contingent on Rejuvica obtaining additional funds.

The parties' subsequent conduct confirms this limited scope. On March 31, 2020, Rejuvica submitted new purchase orders only for the on-hand inventory at the higher prices, paid LNG in full, and received the shipment. This transaction was fully performed by both sides. After that, Rejuvica submitted no further purchase orders and made no further payments. Thus, the only products for which purchase orders were submitted at higher prices, and with the

understanding that payment would occur before or simultaneously to shipment, were for the on-hand products Mr. Dilger had identified and specifically discussed with Ms. Sabin. They had no further discussion about terms, timing of payment, or shipment for anything else. Even with the limited transaction for on-hand products, the parties' actions show that orders were made by purchase orders that reflected the agreed-upon pricing. Besides those orders, there are no purchase orders for specific products that reflect the higher pricing.

While LNG through its current owner Ms. Sabin would have this Court believe that Rejuvica was simply another LNG customer that made an order for which it now needs to pay, it never treated Rejuvica that way. LNG never shipped additional products nor offered to do so, never notified Rejuvica about the status of any products, and never even contacted Rejuvica directly at all. Ms. Sabin herself admitted that she made the personal decision not to ship the remaining product. For over two years, LNG acted as though no obligation existed, because none did.

If LNG genuinely believed Rejuvica was contractually obligated to purchase an additional $280,000 in product, it would have demanded performance, tendered delivery, or at minimum communicated about the purported obligation. Instead, LNG said nothing until after Ms. Sabin was ordered to pay $428,126 in the Valuation Case. The timing suggests this lawsuit is an attempt to manufacture a claim to offset the buyout obligation, not to enforce a genuine contractual right. There was no meeting of the minds, and no contract was formed.

Rejuvica's conduct further confirms the absence of any agreement for the remaining products. As early as March 24, 2020, before the March 30 Email and before the Final Orders, Rejuvica had already begun placing orders with a new manufacturer, Yellow Emperor. At that time, Mr. Dilger viewed Yellow Emperor as a backup supplier while still expecting LNG to

fulfill existing orders. But by mid-April, after Ms. Sabin and the majority owners shut down LNG's operations, it was clear that LNG would no longer serve as Rejuvica's supplier. Rejuvica's prompt turn to an alternative manufacturer is inconsistent with any understanding that it had committed to purchasing over $280,000 in additional products from LNG, or that it considered an enforceable order to have been placed.

### C. The Parties' Course of Dealing Does Not Establish a Contract.

To the extent LNG argues that the parties' course of dealing from 2016 to 2019 somehow establishes a contract for the remaining products, it fails. LNG itself destroyed any prior course of dealing by unilaterally changing the pricing and payment terms in the March 26 Email. Once LNG imposed new terms, the prior course of dealing ceased to govern. Any new agreement had to be formed on LNG's new terms and Rejuvica never accepted those terms for anything beyond the Final Orders.

## II. LNG'S PROMISSORY ESTOPPEL CLAIM FAILS.

Under Utah law, promissory estoppel requires proof of "(1) a promise reasonably expected to induce reliance; (2) reasonable reliance inducing action or forbearance on the part of the promisee or a third person; and (3) detriment to the promisee or third person." *Cottonwood Imp. Dist. v. Qwest Corp.*, 2013 UT App 24, ¶ 3, 296 P.3d 754 (cleaned up). Critically, promissory estoppel requires "a clear and definite promise." *Mitchell v. ReconTrust Co. NA*, 2016 UT App 88, ¶ 53, 373 P.3d 189 (cleaned up). "[T]he alleged promise must be reasonably certain and definite, and a claimant's subjective understanding of the promissor's statements cannot, without more, support a promissory estoppel claim." *Id.* (cleaned up). Preliminary negotiations and indefinite expressions of intent are insufficient. *Nunley v. Westates Casing Services, Inc.*, 1999 UT 100, ¶ 38, 989 P.2d 1077 (holding that communications between parties

amounted to no more than preliminary negotiations and thus could not form basis for promissory estoppel). Even statements like "we have a deal" are unenforceable when important terms remain unresolved. *Graystone Funding Co. v. Network Funding, L.P.*, 2022 WL 1073796, at *5 (D. Utah Apr. 8, 2022).

LNG cannot satisfy any element of this claim. First, there was no clear and definite promise, only a vague, conditional statement about possible future purchases contingent on financing that was never obtained. The businesses knew how to enter agreements for the purchase and sale of products when they wished to do so. That was done through purchase orders that reflected correct quantities and pricing. Such purchase orders do not exist here.

Second, there was no reasonable reliance. LNG's own newly-stated policy unilaterally announced through Ms. Sabin over disagreement of LNG's majority owners, required half-down payments before production could begin, yet LNG never received any such payment for the products at issue and never shipped them. Further, given the acrimonious dispute and lack of trust between Ms. Sabin and Mr. Dilger and Mr. Armstrong, it was unreasonable for Ms. Sabin to interpret Mr. Dilger's March 30 Email as a binding commitment to purchase specific products at higher prices, especially without any purchase orders reflecting this. If Ms. Sabin genuinely believed such a promise existed, she would have followed up in the fashion a vendor follows up with a customer, communicating regarding product status, seeking clarification, or tendering delivery. She did none of these things. No reasonable vendor would sit silently for over two years on a $280,000 obligation, and that is not how LNG dealt with its genuine customers.

**A. There was No Clear and Definite Promise.**

LNG's promissory estoppel claim rests on the same communications that fail to establish a contract. The alleged "promise" is Mr. Dilger's statement that "[t]he rest we will need our LoC



UC_9139531.3

or another amazon transfer." This is not a clear and definite promise to purchase anything. It is, at most, a vague expression of the fact that nothing further could be done without additional cash. The statement identifies no specific products, commits to no quantity, establishes no timeline, and is expressly conditioned on financing that would have to be obtained, but was not certain. A promise must be sufficiently definite that a court can determine whether it was performed or breached. Mr. Dilger's statement satisfies none of these requirements and fails the "clear and definite" standard as a matter of law.

The context of the statement only reinforces its indefiniteness. Mr. Dilger prefaced it by acknowledging that Rejuvica "doesn't have cash right now." A statement that amounts to "we might buy more if we can get financing" is the antithesis of a clear and definite promise. It is precisely the type of preliminary negotiation that cannot support a promissory estoppel claim. *See Nunley*, 1999 UT 100, ¶ 38.

**B. LNG Did Not Act In Reasonable Reliance.**

Even if a promise existed, LNG cannot demonstrate reasonable reliance. The undisputed facts foreclose any such claim:

<u>First</u>, LNG's own policy, announced by Ms. Sabin in the March 26 Email, required half-down payment before any order would be "put in the queue." Rejuvica never paid half down for any products beyond the Final Orders. By LNG's own terms, production should never have begun. LNG cannot claim reliance on a promise while simultaneously ignoring the payment condition it imposed as a prerequisite to performance.

<u>Second</u>, LNG never shipped any of the remaining products. A party that genuinely relies on a promise to purchase would tender delivery and demand payment. LNG did neither. Its

inaction is inconsistent with reliance and consistent only with the understanding that no binding commitment existed.

Third, LNG never once contacted Rejuvica about the remaining products after March 31, 2020. For more than two years, LNG said nothing. No demand for payment. No inquiry about the purported orders. No communication of any kind. This silence is irreconcilable with the conduct of a party that believes has a $280,000 obligation to a customer. In fact, Ms. Sabin admitted at deposition that she personally made the decision not to ship the remaining product to Rejuvica. She further admitted that no one at LNG ever communicated with Rejuvica after April 8, 2020, to demand payment or offer delivery of the purported products. If LNG genuinely relied on a promise to purchase, its decision-maker would not have silently withheld the very products she claimed were ordered.

Fourth, two of LNG's three owners, Mr. Dilger and Mr. Armstrong, holding a combined 60% interest, did not believe any promise had been made or that Rejuvica owed LNG anything beyond the Final Orders. If LNG's majority owners did not believe or understand any promise to exist, LNG cannot credibly claim it reasonably relied on one.

## CONCLUSION

For the foregoing reasons, the evidence at trial will show that LNG's claims for breach of contract and promissory estoppel fail as a matter of fact and law.

DATED: September 3, 2026.

**DENTONS DURHAM JONES PINEGAR P.C.**

*/s/ Peter H. Donaldson*
Peter H. Donaldson
Cole P. Crowther

*Attorneys for Rejuvica, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2026, I caused the foregoing document to be filed electronically and thereby served on all counsel of record:

*/s/ Kim Altamirano*