Thomas R. Barton, USB 6827
Alex B. Leeman, USB 12578
Amanda P. Adomako, USB 20113
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
tbarton@parsonsbehle.com
aleeman@parsonsbehle.com
aadomako@parsonsbehle.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| LIQUID HERBALS MANUFACTURING, LLC, d/b/a Liquid Nutra Group,<br><br>Plaintiff,<br><br>vs.<br><br>REJUVICA, LLC,<br><br>Defendant. | **PLAINTIFF'S TRIAL BRIEF**<br><br>Case No.: 2:22-cv-00387-HCN<br><br>Judge Howard C. Nielson<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to the Court's Trial Order (ECF 54), Plaintiff Liquid Herbals Manufacturing, LLC, d/b/a Liquid Nutra Group ("LNG" or "Plaintiff") submits the following Trial Brief in anticipation of the upcoming four-day bench trial, which will begin on September 22, 2026.

## INTRODUCTION AND THEORY OF THE CASE

This case involves a dispute over whether the Parties reached a "meeting of the minds" in March of 2020, that modified their existing contractual arrangement for LNG's the manufacture of certain products for Rejuvica, LLC ("Rejuvica"), and, if so, what the terms of that agreement were. This is LNG's breach of contract claim. *See* Amended Complaint, pp. 3-7 (ECF 15).

Alternatively, LNG has a claim for promissory estoppel against Rejuvica because it promised to pay for the "rest" of the orders it placed, instead of canceling those orders and informing LNG that it had in fact found a replacement manufacturer. *See id.*, pp. 7-8. In reasonable reliance on Rejuvica's promise, LNG continued its production of those products, which it never received payment for, continues to store, and cannot sell to anyone else. LNG seeks a total of $337,639.78 in contract and estoppel damages. *See id.*, p. 9.

The Parties have different views of what happened, and the Court denied Rejuvica's motion for summary judgment due to disputed issues of material fact. *See* Minute Entry, Dkt. No. 39. LNG, whose principal is Amber Sabin, contends that Rejuvica agreed to LNG's revised pricing and payment terms and failed to pay for products LNG manufactured pursuant to purchase orders. Rejuvica, by contrast, contends that it never accepted LNG's revised terms and should not be responsible to pay for the products in question. The evidence, however, will show that Rejuvica's words and conduct are consistent with LNG's account, not its own.

The Parties had a longstanding business relationship. In 2016, LNG was created for the benefit of Rejuvica, which was LNG's primary customer. LNG provided Rejuvica with discounts ranging from 15% to 25% and allowed it to pay for its purchase orders later than LNG's standard payment terms. Importantly, the owners of Rejuvica, Kyle Armstrong and Kyle Dilger, each owned 30% of LNG and insisted on these terms (Ms. Sabin owned the remaining 40%). By early 2020, LNG was experiencing cash-flow problems and losses on products manufactured for Rejuvica. LNG, acting through Ms. Sabin, adjusted its prices and required Rejuvica to make a 50% down-payment.

In early March 2020, Mr. Armstrong and Mr. Dilger, acting on behalf of Rejuvica, objected to these changes and began secret discussions with a replacement manufacturer. Nevertheless,

Rejuvica continued to place orders throughout March with LNG, which purchased raw materials and engaged in efforts to fulfill the orders of Rejuvica. On March 30, 2020, after Rejuvica had already submitted its first orders to the replacement manufacturer, Rejuvica's COO, Kyle Dilger, told Ms. Sabin in an email that, "We disagree with the pricing changes but we have no choice." He then committed to have Rejuvica pay LNG for "on hand inventory" that was ready to ship to Rejuvica. Rejuvica created revised purchase orders that reflected LNG's increased prices and the existing quantities, which Rejuvica paid for and received. Critically, Mr. Dilger did not cancel the remainder of Rejuvica's orders or inform Ms. Sabin that Rejuvica had found a replacement manufacturer. Instead, Mr. Dilger concluded his March 30th email by indicating that Rejuvica would pay for the remaining orders it had placed with LNG when it had additional cash: "***The rest we will need our LoC or another amazon transfer***" (emphasis added). Thus, LNG continued to manufacture Rejuvica's remaining orders because it understood that Rejuvica needed the products and would pay for them when it had the ability to do so.

In fact, Rejuvica had additional funds in hand, but instead used the money to pay for the orders it placed with the replacement manufacturer. By April 7, 2020, Rejuvica had paid the replacement manufacturer almost $270,000. On April 8, 2020, Mr. Armstrong and Mr. Dilger, acting as the majority owners of LNG and without any warning, closed LNG's manufacturing facility. They also terminated all LNG's employees, including Ms. Sabin and her husband Benjamin, who worked for LNG. Undeterred, the Sabins moved much of LNG's equipment, supplies and inventory to a new location and started a new company, Uintah Basin Herbals ("Herbals"). Ms. Sabin did not continue the production of Rejuvica's orders, but she moved and stored the finished products that LNG had made for Rejuvica, as well as the raw materials that

LNG purchased for Rejuvica. Rejuvica was aware of these products and supplies, but never paid for them and thus LNG never shipped them.

As the Court is aware, a lawsuit among the owners of LNG ensued. *See Armstrong v. Sabin*, Case No. 2:20-cv-261-TS-DAO, United States District Court for the District of Utah, Central Division. Ultimately, Ms. Sabin purchased the interests of Mr. Armstrong and Mr. Dilger in LNG for $214,063 each, as determined by the Court in that litigation (the "Valuation Case"). Herbals has been storing Rejuvica's finished products and supplies for over six years. LNG's invoices to Rejuvica for the products it manufactured, which were all generated before April 8, 2020, total $280,787.99, and the cost of the supplies is $56,851.79. These are the damages sought by LNG for breach of contract or, alternatively, promissory estoppel.

## RELEVANT FACTS

1. When Ms. Sabin left Rejuvica's prior manufacturer, Cedar Bear, in August 2016, Rejuvica's owners, Mr. Dilger and Mr. Armstrong (*see* Defendant's Pretrial Discl. Ex. 19 ("Ex. D-19"), recruited her to help them start a new manufacturing plant in Vernal that could make Rejuvica's products. LNG owned this manufacturing plant.

2. At that time, Mr. Armstrong and Mr. Dilger served as LNG's CEO and CFO, respectively. They each owned 30% of LNG and performed their duties from California where they lived. Ms. Sabin, by contrast, was COO of LNG and ran its daily operations in Vernal. She owned 40% of LNG.

3. Ultimately, Ms. Sabin bought out both Mr. Dilger and Mr. Armstrong pursuant to the Court's Memorandum Decision, dated August 6, 2021, in the Valuation Case. (*See* Plaintiff's Pretrial Discl. Ex. 48 ("Ex. P-48").) Ms. Sabin is now the principal and sole owner of LNG.

4. As LNG's first and primary customer, Rejuvica received favorable pricing and payment terms. Whereas all of LNG's customers were required to pay 50% of their invoice upfront, Rejuvica did not pay LNG until after it had received and counted its invoices, and obtained all documents required by the FDA. (*See* Exs. D-4 and P-16) LNG also charged Rejuvica between $1.00 and $1.50 less per bottle than it charged other customers, amounting to about 15% to a 25% discount, depending on the products. (*See* Ex. P-47, at p.401.) Because of Mr. Armstrong and Mr. Dilger's involvement in both entities, Rejuvica had access to a shared inventory spreadsheet with a list of all of LNG's orders and could keep track of the status of its purchase orders. Rejuvica would email its inventory spreadsheet to LNG whenever it placed orders, and LNG would then update the spreadsheet as the products were manufactured and became ready for shipment. (*See, e.g.*, Exs. D-24, 25.)

6. In January and February of 2020, LNG was experiencing a cash shortage. By the end of January, LNG's operating account with Zions Bank had a negative balance of $35,168.62. (*See* Ex. P-10.) And as of February 26, 2020, LNG's cash was negative $14,350. (*See* Ex. P-13.)

7. In approximately February of 2020, Ms. Sabin and her assistant performed a cost analysis on several of its products, and concluded that it was losing money on some of the products Rejuvica was ordering from LNG. (*See* Ex. D-4 and P-16.) Ms. Sabin believed that LNG's favorable terms for Rejuvica, requiring it to "wait[] for [its] customers to inventory products shipped, is what put the company in a cash crunch." (*Id.*)

8. Based on this analysis, Ms. Sabin, acting on behalf of LNG, increased the prices for several of Rejuvica's products and reiterated its policy of receiving payment before shipment to Rejuvica. (*See id*, *see also* Exs. D-2 and P-14.)

9. Mr. Dilger, on behalf of Rejuvica consented to this change in terms by making up-front payments for its orders as early as February 20, 2020. (*See* Exs. D-1 and P-12.) Mr. Dilger said Rejuvica would revert to the prior arrangement when LNG's cash flow had improved, which it never did.

10. In early March 2020, Rejuvica went back on its commitment and sought to revert to the prior practice where it did not have to pay anything up front to LNG. (*See* Exs. D-2, P-14 and D-3.)

11. On March 4, 2020, Ms. Sabin rejected Rejuvica's attempt to reinstate the old arrangement, and said that LNG's policies needed to be followed and that waiting for payment until customers received the shipments was what put LNG in a cash crunch to begin with. (*See* Exs. D-2,D-3, P-14, and P-15.)

12. That same day, Mr. Dilger agreed to make a down payment to LNG in order to have goods shipped to Rejuvica. (*See* Exs. D-2 and P-14.)

13. On a separate email thread at the same time, however, Mr. Armstrong, disagreed with Ms. Sabin's proposed changes and wrote:

> "this is not a good road to go down. . . [Rejuvica's] orders have been crucial to LNG and we have always timed them according to LNG's needs. . . we have a good thing here with LNG let's not have this get ugly. I'm not going to make any arguments about voting or policy or anything, just that we should do what we have been doing and what is reasonable."

(*See* Ex. D-3 and P-15.)

14. The next day, March 5, 2020, acting on behalf of Rejuvica, Mr. Armstrong secretly contacted another manufacturer—a competitor of LNG's—about swiftly moving Rejuvica's business away from LNG. (*See* Ex. P-21.)

15. Four days later, on March 9, 2020, Rejuvica executed a mutual Non-Disclosure Agreement with the new manufacturer. (*See* Ex. P-19.)

16. Rejuvica continued placing numerous orders with LNG throughout March, specifically on March 2, 4, 9, 11, 16, 17, 24, and 31. (*See* Exs. P-2, attached hereto as Exhibit 1, P-33, attached hereto as Exhibit 2, and D-15).

17. Neither Mr. Armstrong nor Mr. Dilger ever told Ms. Sabin that Rejuvica was moving its business to a new manufacturer.

18. In fact, on March 26, 2020, Mr. Dilger told Ms. Sabin that it was "business as usual" with Rejuvica and that "we all want LNG to be healthy and successful." (*See* Ex. P-27.)

19. LNG's manufacturing facility in Vernal, as directed by Ms. Sabin, purchased materials for Rejuvica, its most important customer, and continued to engage in the manufacture of Rejuvica's products in accordance with the orders placed by Rejuvica. (*See, e.g.* Ex. D-13.)

20. Meanwhile, Rejuvica's communications with the replacement manufacturer progressed. The new manufacturer provided pricing to Rejuvica on March 20, 2020, and Rejuvica placed its first orders on March 24, 2020. (*See* Exs. P-22 and P-24.)

21. Mr. Armstrong, on behalf of Rejuvica attempted to use the fact that it was having to pay LNG, to try to get more favorable payment terms from the replacement manufacturer. On March 23, 2020, Mr. Armstrong wrote, "we were thinking because there are SO many products we have to get started on, ***and since we are really paying two suppliers for inventory***, for the time being, we were hoping we could put half down for the cost of the herb for some portion of the products." (*See* Ex. P-24, emphasis added.)

22. On March 26, 2020, as Rejuvica continued to place orders with LNG in the midst of the Covid-19 pandemic, Ms. Sabin reiterated LNG's price adjustments, reminded Rejuvica

about its outstanding purchase orders worth $537,429.65, and noted that Rejuvica had to make a down payment to ensure that their products were placed in the queue. (*See* Exs. D-12, and P-25, attached hereto as Exhibit 3.)[1] Ms. Sabin attached the applicable invoices, which reflected the increased prices. (*Id.*)

23. When Mr. Dilger asked whether Rejuvica's nonpayment meant the initial orders had not been put into production yet, Ms. Sabin explained that LNG was not ignoring the orders and had ordered the herbs to fulfil them. (*See* Exs. D-13, and P-26.)

24. On March 30, 2020, Rejuvica made a downpayment on its orders with the new manufacturer of $51,750.00. (*See* Ex. P-28.)

25. Also on March 30, 2020, Mr. Dilger further responded to Ms. Sabin's email and stated that Rejuvica had enough money to pay for the inventory LNG had on hand, which Mr. Dilger was able to see since he had access to LNG's inventory figures. (*See* Exs. D-13, P-26, and P-29, attached hereto as Exhibit 4.) Mr. Dilger stated that Rejuvica would need additional funds from a new line of credit or payments from Amazon before it could pay for the remainder orders it had placed with LNG:

> ***We disagree with the pricing change but we have no choice***. On top of the increase, Rejuvica just had to pay down our Amazon loan so we don't have a ton of cash right now. We're waiting for a new larger line of credit to go active soon to get us more funds.
>
> I took a look at the on hand inventory in the order tracking spreadsheet and we have enough cash for the inventory that is ready below. If these can go out tomorrow (Tuesday), then I can have the money in the LNG Comerica account Tuesday morning. ***The rest we will need our LoC or another amazon transfer.***

[1] The parties understood that "queue" referred to a guarantee of delivery between four and six weeks.

(*Id.*, emphasis added.) Importantly, Mr. Dilger did not cancel the remaining Rejuvica orders—i.e., "the rest"—or inform Ms. Sabin that Rejuvica had found a replacement manufacturer. (*Id.*)

26. On March 31, 2020, Rejuvica issued revised purchase orders for the products in question at the adjusted prices and in the quantities reflected in Mr. Dilger's email. (*See* Exs. D-15 and P-33, attached hereto as Ex.2.)

27. Rejuvica transferred the necessary funds to LNG, and the products were shipped by LNG to Rejuvica. This was the last payment made by Rejuvica to LNG.

28. Thereafter, on April 2, 6, and 7, 2020, Rejuvica made payments to the replacement manufacturer for the orders it had placed. Those payments totaled $216,243.89. (*See* Ex. P-4.)

29. On April 8, 2020, without prior consultation with Ms. Sabin, Mr. Armstrong and Mr. Dilger used their status as the "majority members" of LNG to shut down the company and fire all its employees in Vernal, Utah. (*See* Ex. D-9 and P-34, attached hereto as Exhibit 5.) Mr. Armstrong and Mr. Dilger posted the following notice on LNG's warehouse door:

> Due to lack of funding, the majority members of Liquid Herbals Manufacturing, LLC d/b/a/ Liquid Nutra Group ("LNG") have determined to lay off all employees at the Vernal, Utah location. This results in the immediate termination of you as part of a reduction in force…

(*Id.*)

30. The same day, the attorney for Mr. Armstrong and Mr. Dilger (who is also Rejuvica's attorney in this case), sent a letter to Ms. Sabin's attorney stating that LNG was not sufficiently capitalized, that it was not reasonably practicable to carry on LNG's affairs, and that Mr. Armstrong and Mr. Dilger intended to dissolve LNG and wind up its affairs. (*See* Ex. P-36.)

31. Following the shutdown, Ms. Sabin moved all the finished Rejuvica products, including bottles and barrels that LNG had manufactured, as well as the ingredients LNG had purchased for Rejuvica's products, to Herbals' new location, where these materials have since been stored.

32. On December 16, 2020, at her deposition in the Valuation Case, Ms. Sabin testified that Herbals had four or five pallets of Rejuvica products that were made and bottled. She also said that Herbals had raw herbs and extracted liquid for the Rejuvica products that were being stored and not used. (*See* Ex. P-40, pp. 94-95.)

33. Later, at the trial in the Valuation Case, on May 3, 2021, Ms. Sabin again testified about the pallets of finished Rejuvica products and barrels of Rejuvica liquids that Herbals was storing. She testified that Rejuvica had not paid for the products and that nothing could be done with them because they were Rejuvica's products. She also testified about the raw supplies and ingredients that Herbals was storing for use in Rejuvica's products. (*See* Ex. P-45, pp. 96-98.)

34. Photos evidencing the finished Rejuvica products and barrels of liquid Rejuvica product were admitted as evidence in the Valuation Case, and have been submitted in this proceeding by LNG. (*See* Ex. P-6, attached hereto as Exhibit 6.)

35. LNG has identified the invoices and associated purchase orders for all the finished products it produced for Rejuvica. (*See* Ex. P-2, Ex. 2.) The invoices are coordinated with the purchase orders. The invoices were generated and sent to Rejuvica in March and April 2020, after the purchase orders were submitted by Rejuvica. (*See Id*.)

36. LNG has also identified all the raw materials it purchased for Rejuvica, based on its orders, and which cannot be used for any other customer. (*See* Ex. P-1, attached hereto as Exhibit 7.)

37. The amount of the unpaid invoices for the finished Rejuvica products that LNG produced for Rejuvica totals $280,787.99. (*See* Ex. P-2, Ex. 2.) This total includes some testing that was performed by LNG for Rejuvica and is included in the invoices. (*Id.*)

38. The total cost of the raw ingredients that LNG purchased for Rejuvica's products is $56,851.79. (*See* Ex. P-1, Ex. 7.)

## LEGAL ISSUES AND ARGUMENTS

### I. LNG AND REJUVICA HAD A LONGSTANDING CONTRACTUAL ARRANGEMENT AND, WITH RESPECT TO ITS OUTSTANDING PURCHASE ORDERS IN MARCH 2020, REJUVICA AGREED TO MODIFIED TERMS.

The provisions of UCC § 2-204 (Utah Code § 70A-2-204) provide guidance in analyzing the evidence in this case. According to the statute:

> (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
>
> (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
>
> (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Utah Code Ann. § 70A-2-204. Further, "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." Utah Code Ann. § 70A-2-207. Under the UCC, contracts can be modified, and no consideration is necessary for an agreement modifying a contract to be binding. Utah Code Ann. § 70A-2-209.

Utah law requires a showing of four elements to demonstrate breach of contract: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bear v. LifeMap Assurance Co.*, 2021 UT App 129, ¶ 16, 503 P.3d 507, 513 (quoting *America West Bank Members, LC v. Utah*, 2014 UT 49, ¶ 15, 342 P.3d 224). This Court has previously noted with regard to contract formation: "In cases where material facts are in dispute, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact." *Republic Bank, Inc. v. W. Penn Allegheny Health Sys., Inc.*, No. 2:08CV934 DAK, 2010 WL 697361, at *3 (D. Utah Feb. 24, 2010).

To support its argument that the Parties did not have an enforceable agreement in March 2020 with regard to LNG's increased prices and different sales terms, Rejuvica has argued that Ms. Sabin rejected Rejuvica's initial order when she unilaterally increased the product prices and required Rejuvica to make a 50% down payment. This position is incorrect. "The acceptance of an offer may be found if in the relevant circumstances, a party would know or have reason to know that the other party may infer from his words of conduct that he assents to the terms of the deal." *See Rossi v. University of Utah*, UT 2021 43, ¶ 34.

The fundamental issue is, what did the parties intend? As noted in *Republic Bank*, 2010 WL 697361, at *3, "[t]he Uniform Commercial Code, its draftsmen mindful of the haste and sloppiness, and disregard for lawyerly niceties that characterize commercial dealing, tolerates a good deal of incompleteness and even contradiction in offer and acceptance." *Citing Adani Exports Ltd. v. AMCI Export, Corp.*, 2007 WL 4298525 (W.D.Pa. December 4, 2007) (unpublished). In both *Republic Bank*, 2010 WL 697361, at *2-3, and *Adani*, 2007 WL 4298525, at *3-8, 11-19, there were various emails between the parties that the courts considered and determined could give rise to a contract—

i.e., offer and acceptance—such that summary judgment was inappropriate. As noted in the UCC, unless otherwise unambiguously indicated by the language or circumstances, "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Utah Code Ann. § 70A-2-206(1)(a).

In this case, there is no question that Rejuvica and LNG had a longstanding contractual relationship. It involved purchase orders from Rejuvica, invoices from LNG, payment terms and shipping terms. But, in early 2020, those terms were changing. In February, Rejuvica agreed to make payments ***before*** receiving shipped goods from LNG. And it voluntarily advanced $5,000 to help maintain LNG's solvency. These changes were not reflected in the invoices or purchase orders, but in the emails and the conduct of the parties. Then, in early March, Rejuvica tried to revert to the parties' old contractual arrangement, but Ms. Sabin, acting on behalf of LNG, refused. She demanded payment from Rejuvica before LNG would ship finished goods. Mr. Dilger, acting on behalf of Rejuvica, relented and sent payment on or about March 4, 2020, so that LNG would ship the goods.

Although this change by LNG led Rejuvica to seek out, engage, and ultimately pay a replacement manufacturer, it did not stop ordering goods from LNG. On the contrary Rejuvica placed multiple orders with LNG after March 5, 2020, and gave no indication that it was going to pull its business or cancel orders. On the contrary, on March 26, 2020, Mr. Dilger indicated that it was business as usual with Rejuvica—despite the Covid-19 pandemic—and said that everyone wanted "LNG to be healthy and successful." At the time, Rejuvica had in fact signed an agreement with the replacement manufacturer and actually placed orders. The Court should interpret Mr. Dilger's statement for what it was: A lie meant to keep LNG producing products that Rejuvica might need if its arrangements with the other manufacturer did not work out.

Then, on March 26, 2020, Ms. Sabin sent an email with updated invoices for over $500,000 worth of products that Rejuvica ordered. These invoices reflected increased prices, and in her email, Ms. Sabin stated that half of the invoice price needed to be paid up front. In response, Mr. Dilger said that Rejuvica "disagree[s] with the pricing change but we have no choice." Under the circumstances, this unqualified statement should be construed as an acceptance. It is certainly not a rejection of the invoice terms, nor is it a counteroffer with a lower price or different payment terms. Mr. Dilger did not cancel any of Rejuvica's purchase orders. Although Mr. Dilger said, "we have no choice," this was not true because he and Mr. Armstrong constituted the majority members of LNG. Besides, saying "we have no choice," indicates acceptance, not rejection.

The remainder of Mr. Dilger's email and Rejuvica's actions confirms its acceptance of the invoice terms. Mr. Dilger had checked LNG's inventory and saw that LNG had finished making many of products ordered by Rejuvica, but not all. Then, on behalf of Rejuvica, he committed to buy the existing inventory at the invoiced prices and make payment the next day. This is the language and conduct of acceptance. Finally, Mr. Dilger closed his email by writing, "The rest we will need our LoC or another [A]mazon transfer." In other words, we have a deal on the new pricing, not just for the products Rejuvica was paying for at the time, but for "the rest" as well. Ms. Sabin will testify that this is how she understood Mr. Dilger's email.

Subsequently, at Ms. Sabin's request, Rejuvica created revised purchase orders with the updated pricing and partial amounts. When Ms. Sabin indicated that the products were ready to go on March 31, 2020, Mr. Dilger said "Awesome." Rejuvica paid and the products were shipped. After that, LNG continued working on making products to satisfy the remainder of Rejuvica's outstanding purchase orders since it reasonably believed Rejuvica, its most important customer, would pay for that product when it was ready and when Rejuvica had the funding. When Rejuvica

failed to pay, it breached the parties' agreement. LNG has been damaged in the amount of the outstanding invoices and the materials it purchased for Rejuvica's exclusive use: $337,639.78.

## II. LNG REASONABLY RELIED ON A CLEAR AND DEFINITE PROMISE FROM REJUVICA.

Alternatively, the Court should find that LNG detrimentally relied on Rejuvica's promise. "A promise which the promisor should reasonably expect to induce action. . . on the part of the promisee or a third person and which does induce such action of forbearance is binding if injustice can be avoided only by enforcement of the promise." *Tolboe Constru. Co. v. Staker Paving & Constru. Co.*, 682 P.2d 843, 845 (Utah 1984)(citing Restatement (Second) of Contracts § 90). Promissory estoppel is a doctrine of equity. *See Union Tank Car Co. v. Wheat Bros.*, 387 P.2d 1000, 1003 (Utah 1964). Equity recognizes the unfairness of withdrawal of a promise made by the defendant while "aware of all the material facts." *Global Fitness Holdings v. Frai*, 127 F. Supp.3d 1228, 1242 (D. Utah 2015). Specifically, the Plaintiff must show that "[the defendant" made the promise when they knew that the plaintiff was acting in reliance on it; that the latter observing reasonable care and prudence, acted in reliance on the promise and got into a position where it suffered a loss." *See Union Tank Car Co.,* 387 P.2d 1000 at 1003; accord, *Ferrer v. Taft Strucurals, Inc.*, 587 P.2d 177, 179 (Wash. App. 1978).

Rejuvica contends that LNG did not act prudently or reasonably rely on any clear and definite promise when it manufactured products for Rejuvica. But the record contains no evidence establishing that LNG's reliance on Rejuvica's March 30, 2020, promise was unreasonable or unfounded. To the contrary, the evidence amply demonstrates that LNG's reliance was reasonable. Rejuvica's March 30, 2020, email constitutes a clear and definite promise to pay LNG for the remainder of the orders it had placed. That is what was communicated when Mr. Dilger said, "The

rest we will need our LoC or another [A]mazon transfer." With regard to the on-hand inventory that Rejuvica was purchasing with its available funds, Mr. Dilger did not need to make this statement. If all Rejuvica intended to buy was the on-hand inventory, with no commitment beyond that, Mr. Dilger would have stayed silent. But he did not. Instead, his statement was a promise signaling that LNG should continue producing the remainder of the products that Rejuvica had ordered (i.e., "the rest") because Rejuvica would purchase them when it was financially able.

LNG and its Vernal employees therefore continued to make the remainder of the purchase orders based on Mr. Dilger's promise. Ms. Sabin, acting for LNG, was unaware that Rejuvica was not planning on paying for the rest of the products if things worked out with the replacement manufacturer (which they did) because Mr. Armstrong and Mr. Dilger withheld this information from her. Thus, in accord with principles of equity, the Court should not hesitate to find that LNG reasonably and detrimentally relied on Mr. Dilger's promise on March 30, 2020. LNG's reliance continued until Mr. Armstrong and Mr. Dilger shut down LNG's operations, without consulting Ms. Sabin, on April 8, 2020. LNG's cessation of production after its plant was shut down by the owners of Rejuvica reinforces that Ms. Sabin's initial reliance was reasonable but ended when Rejuvica's true intentions were discovered. It also indicates a mitigation of LNG's damages. LNG was damaged in the amount of $337,639.78, which represents the invoiced amounts and costs of the materials that LNG expended on Rejuvica up until April 8, 2020.

## **CONCLUSION**

For the foregoing reasons and based on evidence and testimony to be presented at trial, the Court should either find that Rejuvica and LNG had a valid and enforceable contract in March 2020 or that LNG reasonably and detrimentally relied on Rejuvica's promise, and award damages to LNG of $337,639.78.

DATED this 3rd day of September, 2026.

**PARSONS BEHLE & LATIMER**

*/s/ Thomas R. Barton*
Thomas R. Barton, Esq.
Alex Leeman, Esq.
Amanda P. Adomako, Esq.

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of September, 2026, I caused a true and correct copy of the foregoing **PLAINTIFF'S TRIAL BRIEF** to be filed via the Court's electronic filing system which sent notice of such filing to all counsel of record.

*/s/Thomas R. Barton*